IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
|  | * |  |
| TASHA ALLEN, *et al*. | * |  |
| Plaintiffs, | * |  |
| v. | * | CIVIL NO.: WDQ-11-1826 |
| GENERAL STAR INDEMNITY CO., | * |  |
| Defendant. | * |  |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Tasha Allen and others (the "Plaintiffs") sued General Star Indemnity Co. ("General Star") for breach of contract and declaratory relief.  For the following reasons, General Star's motion to dismiss the complaint will be granted in part and denied in part.

I. Background[1]

General Star is an insurance company based in Stamford, Connecticut, and licensed in Maryland.  Compl. ¶ 5.  Effective March 15, 2006, it provided a general liability policy (the "Policy") to the State of Maryland for foster care placement.  Compl., Ex. 3, at 1.  The policy defined foster parents as

> those individuals who care for children under foster
> parent programs licensed, approved or administered by

---

[1] For General Star's motion to dismiss, the well-pled allegations in the Plaintiffs' complaint are accepted as true.  *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

the Department of Human Resources, Department of
Juvenile Justice (state or regional offices) or local
departments of social services of the State of
Maryland.

"Foster parents" includes any individual who cares for
children on an emergency basis under a state
sanctioned shelter care program.

*Id.* at 35.

The Policy covered certain

"bodily injury," "property damage" or "personal and
advertising injury" claims brought against a "foster
parent(s)" by a natural parent(s) of a foster child as
a result of injuries sustained by that foster child .
. .

*Id.* at 35.   The Policy applied only to "bodily injury" and

"property damage" that was "caused by an 'occurrence,'" which

the Policy defined as "an accident,[2] including continuous or

repeated exposure to substantially the same general harmful

conditions." *Id.* at 9, 23.   The Policy did not apply to bodily

injury "expected or intended from the standpoint of the

insured." *Id.* at 9.

The Policy further provided that

[General Star] will pay those sums that the insured
becomes legally liable to pay as damages because of
"bodily injury" or "property damage" to which this
insurance applies. [General Star] will have the right
and duty to defend the insured against any "suit"
seeking those damages. However, [General Star] will
have no duty to defend the insured against any "suit"
seeking damages for "bodily injuries" or "property
damage" to which this insurance does not apply.

---

[2]   The Policy did not define "accident."

2

[General Star] may at [its] discretion investigate any "occurrence" and settle any claim or "suit" that may result.

*Id.* at 9.

The Policy excluded coverage for claims by "anyone acting on behalf of or in lieu of any natural parent or guardian ad litem, of a foster child." *Id.* at 37 (Endorsement 9). Natural parents' claims were subject to a $200,000 limit per claim. *Id.* at 36 (Endorsement 8).

In June 2006, two-year-old Kyla Edwards was placed in foster care in the Salisbury, Maryland, home of Madgeline Dashield and her fiancé Edson Brown. Compl. 8; Mot. to Dismiss 1. Dashield was licensed by the state of Maryland as a foster care provider; Brown was not. Compl. 8.

On December 19, 2006, Kyla died from internal injuries caused by blunt force trauma. Compl. ¶ 16. In the hours before her death, she had been at day care and in Brown's custody. *Id.*

On December 20, 2006, an autopsy determined that Kyla had been beaten to death. *See* ECF No. 10-3 (Autopsy Report) at 1. The same day, Brown was criminally charged with abuse and murder.[3] On June 19, 2007, he entered an *Alford* plea[4] to second

---

[3] Compl. ¶ 17; *Man Accused of Killing 2-year-old*, The (Annapolis) Capital, Dec. 22, 2006, at A4.

[4] By entering an *Alford* plea, a defendant consents to a prison sentence "even if he is unwilling or unable to admit his

degree murder and was sentenced to 30 years in prison.  Compl. ¶
17, Ex. 14 at 6, 16.  Brown told the court that he was not
guilty of the crime, and he has maintained his innocence.
Compl. ¶ 17, Ex. 14 at 9-10.

On June 2, 2008, Kyla's mother, Tasha Allen; Kyla's
grandmother Cathy Wharton[5]; and Kyla's father, Bernard Harper,
brought a nine-count wrongful death and survival action (the
"Wrongful Death and Survival Action") in the Circuit Court for
Wicomico County against Brown, Dashield, and the Maryland
Department of Human Resources.  Compl. ¶ 18, Ex. 4 at 1.

Count III, Wharton's survival action[6] against Brown, alleged
that Brown was an "unlicensed foster care provider" with "a
history of violent behavior," Brown had a duty to protect Kyla
"from all known and reasonably foreseeable hurt/harm or danger
inclusive of abuse and neglect," and he "accidentally,
unintentionally, and/or with a depraved heart caus[ed] [Kyla] to
agonize and suffer torture and violence through his own reckless
conduct."  Compl., Ex. 4 at ¶ 76.  Count III further alleged
that Kyla was "severely injured at the hands of Defendant Edson

_____

participation in the acts constituting the crime."  *North
Carolina v. Alford*, 400 U.S. 25, 37 (1970).

[5] Wharton is also the personal representative for Kyla's estate.
Compl. 1.

[6] The personal representative of an estate may bring an action
that the decedent would have been entitled to bring.  Md. Code
Ann., Est. & Trusts § 7-401(y).

Brown from a blunt force trauma to the abdomen that caused intestinal rupture and severe bleeding," and Kyla "was conscious and living after the incident, surviving until the time of her death." *Id.* ¶ 78. Count III asserted that "the negligent acts, and senseless acts of violence of Defendant Edson Brown, result[ed] in [Kyla's] death" and were "the direct and proximate cause of her pre-impact fright, torture, personal injuries, pain & suffering and ultimate death." *Id.* ¶ 79.

Allen and Harper re-alleged many of these facts in Counts VI and IX (wrongful death[7]) and further asserted that Kyla's "life was wrongfully terminated by senseless acts of violence of Defendant Edson Brown." *Id.* ¶¶ 118, 158. Each count against Brown also incorporated the following allegations:

- Brown was "serving 30 years in prison for child abuse resulting in [Kyla's] death and second degree murder." *Id.* ¶ 5.

- Brown "would assist with the care and custody of foster children placed in the home." *Id.* ¶ 16.

- Brown was authorized to transport Kyla between the foster home and day care. *Id.* ¶ 23.

---

[7] Maryland's wrongful death statute provides for a cause of action "against a person whose wrongful act causes the death of another." Md. Code Ann., Cts. & Jud. Proc. § 3-902(a). "'Wrongful act' means an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." *Id.* § 3-901(e).

- Brown had a violent criminal history, and had been
  convicted of domestic abuse, first degree assault, and drug
  offenses. *Id.* ¶ 24.

- Twice while Kyla was living at Dashield's home, Wharton,
  Harper, and others had reported possible physical abuse to
  state officials after finding bruises on Kyla's face, chest
  and upper torso. *Id.* ¶ 33.

- On December 17, 2006, Wharton witnessed Brown "aggressively
  snatch[]" Kyla by the arm while picking her up at day care,
  and yell at her because she was crying. *Id.* ¶ 35.

- On December 18, 2006, Dashield left Kyla alone with Brown.
  *Id.* ¶ 36.  Upon her return, Dashield found Kyla
  unresponsive. *Id.* ¶ 37.  Kyla was rushed to a hospital,
  where she was pronounced dead. *Id.* ¶¶ 38-39.

- Medical records showed that Kyla had been "brutally
  beaten." *Id.* ¶ 37.  "[G]iven the density of the clotted
  blood of her internal organs, it was more likely than not
  that the beating occurred while she was in the custody of
  Defendant Brown." *Id.*

- "[T]he State had knowledge of Defendant Brown's close
  proximity to the victim so as to make her a likely target."
  *Id.* ¶ 58.

- Dashield breached her duty to provide care to Kyla by "placing her, without supervision, into the care and custody of an unlicensed known violent offender who was ineligible, unqualified, and incapable of caring for" Kyla because of his "lack of temperament" and "anger management." *Id.* ¶ 65.

General Star appointed counsel to Dashield, answered the claims against her, and settled with the Plaintiffs before trial,[8] but the company refused Brown's repeated requests for counsel. Compl. ¶¶ 20, 23, 25. The company also refused to speak with Brown or investigate whether he had a meritorious defense. Compl. ¶¶ 20-21. Brown believed that Kyla must have been injured while at day care, and he, "at worst," failed to seek medical care after picking her up. Compl. ¶ 21. On August 18, 2008, Brown filed a *pro se* answer to the complaint.[9] Compl. ¶ 24.

Brown continued to request counsel from General Star. Compl., Ex. 5-8. On July 27, 2009, he filed a *pro se* motion requesting "coverage by the State" and wrote a separate request

---

[8] The Plaintiffs settled with Dashield in June 2009. Compl., Ex. 8 at 2.

[9] Neither the Plaintiffs nor General Star have provided the Court a copy of Brown's Answer.

to General Star.[10]   Compl., Ex. 5, 6.  In his motion, Brown argued that he had cared for the foster children in the home he shared with Dashield and had "been maintaining [his] innocence in this case," "medical reports state[d] [that] the victim's injuries happened 3 to 4 hours before death," and Kyla "was only in [Brown's] company for 55 minutes."  Compl., Ex. 5 at 1-2. The Court denied his motion because it had no authority to grant his request.  Compl., Ex. 2 (docket entry 11/0).  In the letter to General Star, Brown said that his theory was that Kyla's injury "was sustained at day care."  Compl., Ex. 6 at 2.

On September 11, 2009, General Star denied Brown coverage, defense, and indemnification.[11]  General Star said that (1) Brown was not insured under the Policy because he was not a foster parent; (2) the Wrongful Death and Survival Action did not allege that Kyla's death resulted from an "occurrence" as defined by the Policy; and (3) the exclusion for bodily injury "expected or intended from the standpoint of the insured"

---

[10] Brown addressed the letter "[t]o whom it may concern," gave it to plaintiffs' counsel, and asked that they forward it "to [the] appropriate insurance carrier."  Compl., Ex. 6 at 2, Ex. 7. Plaintiffs' counsel forwarded the letter to the Maryland Attorney General with a cover letter noting that Brown "ha[d] definitely set forth a compelling argument as to why he should be afforded counsel and coverage."  Compl., Ex. 7 at 1.  Counsel also forwarded the letter to General Star with a cover letter noting Brown's "legitimate and reasonable theory of a defense" and "a potentiality of coverage."  Compl., Ex. 8 at 2.

[11] General Star denied coverage in a letter that Brown received around September 15, 2009.  Compl. ¶ 27.

8

precluded coverage.  Compl., Ex. 10 at 5-6.  The company further stated that, had Brown been insured, Wharton's claims would not be covered, because she was not Kyla's natural parent; Allen and Harper's claims would be limited to $200,000, less the amount paid as part of Dashield's settlement with the Plaintiffs.  *Id.* at 6-7.

The State of Maryland settled with the Plaintiffs shortly before trial, which began on September 14, 2009.  Compl. ¶ 28, Ex. 2; ECF No. 10-1 at 9.  Brown was not represented by counsel.  Compl., Ex. 2.  On September 15, 2009, the jury found Brown liable for Kyla's wrongful death and awarded Allen, Wharton, and Harper a $901,000 judgment against him.  Compl. ¶ 9; ECF No. 10-4.  The verdict sheet did not specify whether the jurors had found that Brown acted negligently or intentionally in causing Kyla's death.  *See* ECF No. 10-4.

On June 25, 2011, Brown assigned to Allen, Wharton, and Harper "any and all causes of action against General Star . . . arising from" the Policy.  Compl. ¶ 30, Ex. 1.  In exchange, Allen, Wharton, and Harper agreed to "dismiss any and all claims, [and] judgments against [Brown]."  *Id.*

On July 1, 2011, Allen, Wharton, Harper, and Brown sued General Star, seeking damages for breach of contract and a declaratory judgment that General Star owed a duty to defend and/or indemnify Brown under the Policy.  On August 18, 2011,

9

General Star moved to dismiss.  ECF No. 10.  On September 6, 2011, the Plaintiffs opposed that motion.  ECF No. 11.  On September 23, 2011, General Star filed a reply.  ECF No. 12.

II. Analysis

  A. Standard of Review

    Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

    The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001).

    Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003).  These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

    To present a facially plausible complaint, a plaintiff must do more than "plead[] facts that are 'merely consistent with' a

10

defendant's liability"; the facts as pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 1950 (*quoting* Fed. R. Civ. P. 8(a)(2)).

"[W]he[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not show[n]--that the pleader is entitled to relief." *Id.* (citation and internal quotation marks omitted).

The Court "should view the complaint in a light most favorable to the plaintiff," and "accept as true all well-pleaded allegations," *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993), but the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "allegations that are mere[] conclus[ions], unwarranted deductions of fact, or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (citation and internal quotation marks omitted).

B. General Star's Motion

The Plaintiffs assert that General Star breached its contractual duty to defend Brown in the Wrongful Death and

11

Survival Action. Compl. ¶¶ 31-38, 50-57, 69-76, 88-95. The Plaintiffs also seek a declaratory judgment that General Star had a duty to defend Brown. Compl. ¶¶ 39-49, 58-68, 77-87, 96-106.

General Star argues that the Court must dismiss the entire complaint because (1) Brown was not a foster parent as defined by the Policy, and (2) had Brown been covered, Kyla's injuries would have been "expected or intended from the standpoint of the insured," and not arising from an accident. ECF No. 10-1 at 1-2. To the extent that the Policy covered Brown and his conduct, General Star argues that the Court must dismiss Brown's claims, because he assigned his rights and lacks standing to seek relief. *Id.* at 2. General Star also contends that the Policy excludes coverage of Wharton's claims, because she is not Kyla's natural parent. *Id.*

1. Definition of "Foster Parent"

The parties dispute whether Brown was a foster parent covered by the Policy, which provides that

> "Foster parents" means those individuals who care for children under foster parent programs licensed, approved or administered by the Department of Human Resources, Department of Juvenile Justice (state or regional offices) or local departments of social services of the State of Maryland.
>
> "Foster parents" includes any individual who cares for children on an emergency basis under a state sanctioned shelter care program.

12

Compl., Ex. 3 at 35.  The parties disagree about whether the definition requires the state to sanction the individual care provider, or merely the program through which he has contact with the child.

General Star argues that Brown was not a foster parent, because he was never certified or approved as a foster care provider by the state.  ECF No. 10-1 at 14.  Thus, the company contends that he "could not as a legal matter provide care[12] 'under' the state sanctioned programs to which the Policy applies."  *Id*.  General Star argues that "to qualify as one who 'cares for children' within the Policy definition, the person must do so 'subject to the authority, control, guidance or instruction of' the State programs."  *Id*. at 15.

The Plaintiffs counter that Brown was a foster parent because he cared for a child who had been placed in a foster care program run by Dashield, and that program was "licensed, approved or administered by" the state.  ECF No. 11 at 11.  They argue that "it is the foster parent program that must be licensed," "[n]ot the individual care provider."  *Id*. (internal quotation marks omitted).  The Plaintiffs contend that Brown was "equally involved" in "caring for the children placed in his

---

[12] General Star assumes -- but does not concede -- that Brown's conduct constituted "care."  ECF No. 10-1 at 14.

home," and he did so "subject to the authority, control, guidance, or instruction" of the state. *Id.* at 12-13.

Under Maryland law,[13] the interpretation of an insurance contract, "like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co. v. Callway*, 825 A.2d 995, 1005 (Md. 2003). If the policy provisions are plain and unambiguous, the Court determines the meaning of the terms as a matter of law. *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000). A term is unambiguous if a reasonable person would find it susceptible to only one meaning.[14] If a term is ambiguous, however, the Court may not resolve the ambiguity on a motion to dismiss.[15]

---

[13] The parties' briefs rely on Maryland law. Because this is a diversity jurisdiction case, *see* Compl. ¶ 7, the court "must apply the substantive law of the forum state." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). Under Maryland law, an insurance contract is controlled by the law of the state in which the policy is delivered and the premiums are paid. *Cont'l Cas. Co. v. Kemper Ins. Co.*, 920 A.2d 66, 69 (Md. Ct. Spec. App. 2007). Here, that state is Maryland, the location of Maryland's Department of Human Resources and Department of Juvenile Justice. *See also French v. Assurance Co.*, 448 F.3d 693, 700 (4th Cir. 2006) (applying Maryland's substantive law regarding the interpretation of an insurance policy issued to a Maryland policyholder).

[14] *See Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 736 (D. Md. 2005); *Soc'y of Am. Foresters*, 689 A.2d 662, 667 (Md. Ct. Spec. App. 1997).

[15] *See, e.g., Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) (reversing trial court's grant of motion to dismiss because the contract was "not free of ambiguity"); *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)

The Policy's definition of "foster parent" is ambiguous.  A reasonable person could read the definition to apply only to individuals licensed by the state to provide foster care, or, alternatively, to anyone who cares for a child who has been placed in a licensed foster care program.  This is "a factual determination that precludes dismissal on a motion for failure to state a claim."  *Hardwire LLC*, 360 F. Supp. 2d at 736.

2. Whether the Wrongful Death and Survival Action Alleged an "Accident"

To the extent that Brown was within the Policy's provisions, the parties dispute whether General Star had a duty to defend him based on the allegations in the Wrongful Death and Survival Action.

Maryland courts "construe an insurer's duty to defend its insured very broadly."[16]  Thus, courts consider two questions when deciding whether an insurer has a duty to defend: (1) what does the policy cover, and (2) "do the allegations in the tort action potentially bring the tort claim within the policy's coverage?"  *Sheets v. Brethren Mut. Ins. Co.*, 679 A.2d 540, 542

---

("The construction of a contract is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim."); *Hardwire LLC*, 360 F. Supp. 2d at 736 ("an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

[16] *Trice, Geary & Myers, LLC v. Camico Mut. Ins. Co.*, Case No. 10-1473, 2011 WL 6425701, at *5 (4th Cir. 2011).

15

(Md. 1996) (internal citation omitted).  "[T]he underlying tort suit need only *allege* action that is *potentially covered* by the policy, no matter how attenuated, frivolous, or illogical the allegation may be." *Id.* at 544 (emphasis in original).  If there is even a "potentiality" that the claims are covered by the policy, the insurer has a duty to defend. *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 619-20 (Md. 1995).  "[A]ny doubt as to whether there is a potentiality of coverage . . . is to be resolved in favor of the insured."[17]

When the underlying complaint "neither conclusively establishes nor negates a potentiality of coverage," an insured may rely on extrinsic evidence to show that the plaintiff claimed an injury covered by the policy.  *Walk*, 852 A.2d at 106-07 (internal citation and quotation marks omitted).  Extrinsic evidence establishes the potentiality of coverage if "the insured shows that there is a reasonable potential that the issue triggering coverage will be generated at trial." *Id.* at 110.  But "an insured cannot assert a frivolous defense to establish an insurer's duty to defend." *Id.* at 107.

In determining what the complaint has actually alleged, "the words of a pleading will be given reasonable construction." *Lapides v. Trabbic*, 758 A.2d 1114, 1116 (Md. Ct. Spec. App.

---

[17] *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 394 (Md. 2006) (internal citation and quotation marks omitted).

16

2000).   "It is the substance of the underlying claim, not its label, that controls in duty-to-defend and coverage cases." *Travelers Indem. Co. of Am. v. Coleman*, 236 F. Supp. 2d 513, 516 (D. Md. 2002).   Thus, courts must "look beyond labels and conclusory averments and make determinations based on the substance of the allegations of a pleading."[18]   A complaint "need not contain unnecessary evidence,"[19] and the plaintiff may set forth "many separate claims," "regardless of consistency."[20]

"[B]ecause both the plaintiff and the defendant in a tort suit share a common interest in coverage being applicable, there

---

[18] *Piven v. Comcast Corp.*, 916 A.2d 984, 991 (Md. 2007).   *See also Blondell v. Littlepage*, 968 A.2d 678, 685 (Md. Ct. Spec. App. 2009) (claim was construed as fraudulent inducement because plaintiff had pled facts constituting that tort, even though he had labeled his claim "fraud or deceit").   *Cf. Ver Brycke v. Ver Brycke*, 843 A.2d 758, 774 (Md. 2004) ("the parties' characterization of their claims does not determine equity jurisdiction"); *DiPino v. Davis*, 729 A.2d 354, 369 (Md. 1999) ("an action against a local governmental official cannot be classified as official-capacity or personal-capacity simply because of the labels used by the parties") (internal quotation marks omitted); *Brown v. Rabbitt*, 476 A.2d 1167, 1169 (Md. 1984) (whether a claim falls under a health care statute requiring arbitration turns on whether the claim "is based on the rendering or failure to render health care and not on the label placed on the claim").

[19] *Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.*, 885 A.2d 381, 389 (Md. Ct. Spec. App. 2005).

[20] Md. R. 2-303(c).   The Plaintiffs improperly cited the federal rules of civil procedure as governing the Wrongful Death and Survival Action.   *See* ECF No. 11 at 18.   Because that complaint was filed in the Circuit Court for Wicomico County, Maryland's rules of civil procedure applied.   The federal rules of civil procedure govern only the complaint in this action.

may be collusion and an effort to manipulate coverage." *Pettit v. Erie Ins. Exch.*, 709 A.2d 1287, 1289 (Md. 1998). "[W]here the allegations in the tort suit . . . obviously constitute a patent attempt to recharacterize, as negligent, an act that is clearly intentional," the insurer has no duty to defend under a policy that does not cover intentional acts.[21]

Here, the Policy applied only to bodily injuries caused by an occurrence, that is, "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Compl., Ex. 3 at 9, 23. Maryland courts have held that an act constitutes an "accident" under a liability insurance policy when "the resulting damage was an event that takes place without the insured's foresight or expectation." *Sheets*, 679 A.2d at 548 (internal citation and quotation marks omitted). Thus, to raise a potentiality of coverage, the Wrongful Death and Survival Action had to allege that Brown caused Kyla's death without foreseeing or expecting it. *See id.*

---

[21] *See Allstate Ins. Co. v. Atwood*, 572 A.2d 154, 157-58 (Md. 1990). *Accord Littiz Mut. Ins. Co. v. Bell*, 724 A.2d 102, 103-04 (Md. 1999) (plaintiff could not avoid operation of an exclusion for intentional acts by alleging that the defendant in the underlying action had "negligently struck her"); *Pettit*, 709 A.2d at 1288-92 (policy did not cover alleged sexual molestation, even though plaintiff had characterized tort as negligence, because "sexual molestation is a tort which is only committed intentionally"); *Saba v. Darling*, 575 A.2d 1240, 1243-44 (Md. 1990) (plaintiff could not characterize defendant's battery as negligence in order to bring it within defendants' insurance policy).

General Star argues that the Plaintiffs have not stated a claim for breach of contract or declaratory relief because the Wrongful Death and Survival Action did not accuse Brown of killing Kyla by accident.  ECF No. 10-1 at 17-23.  The company points out that the Plaintiffs asserted that Kyla was "severely injured at the hands of Defendant Edson Brown from a blunt force trauma" involving "senseless acts of violence."  *Id.* at 17. General Star argues that "[t]he bald legal conclusion that a brutal beating could be administered 'accidentally' does not support [P]laintiffs' position, nor does well established Maryland law."  *Id.*  General Star also argues that the conduct is excluded because Brown would have expected or intended injuries to result from beating Kyla.  *Id.* at 22-23.

The Plaintiffs counter that the Wrongful Death and Survival Action raised a potentiality of coverage because it asserted that Brown "assist[ed] with the care and custody of foster children placed in the home," and he "accidentally, unintentionally *and/or* with a depraved heart" caused Kyla to "suffer torture and violence through his own reckless conduct." ECF No. 11 at 17 (emphasis in original).  They contend that these allegations made it plausible that Kyla's injuries resulted from Brown's "tripping and falling with baby Kyla in his arms," "some other reckless conduct of an accidental nature," or "Brown's failure or refusal to render first aid to

19

baby Kyla when she displayed symptoms of grave injury." *Id.* at 17.  They argue that the complaint "presented alternative theories of liability" because "[w]hether her injuries were sustained by accidental or intentional conduct has always been a mystery in this case." *Id.* at 18.  They further contend that Brown "introduced a meritorious defense." *Id.*

The Court finds it inappropriate, at this early stage in the litigation, to decide as a matter of law whether General Star had a duty to defend Brown in the Wrongful Death and Survival Action.  Although the complaint alleged that Brown's "senseless acts of violence" caused Kyla's death, it also asserted more broadly that he "accidentally, unintentionally, and/or with a depraved heart" caused her injuries.  Compl., Ex. 4 at ¶¶ 76, 79.  Kyla's relatives were free to plead in the alternative, "regardless of consistency." *See* Md. R. 2-303(c).[22] That General Star thought it implausible that Brown acted accidentally or unintentionally did not negate the duty to defend; even frivolous or illogical accusations may raise the potentiality of coverage. *See Sheets*, 679 A.2d at 544.

---

[22] The complaint did not merely qualify the words "violence" or "beating" with "negligent."  Thus, it differed from earlier cases in which Maryland courts have found no duty to defend. *See, e.g.*, *Pettit*, 709 A.2d at 1288 (plaintiff alleged that the insured had negligently sexually molested her children); *Lititz Mut. Ins. Co.*, 724 A.2d at 104 (plaintiff alleged that defendant had "negligently struck her").

Because of the "broad discretion" in deciding how to handle a declaratory judgment action,[23] the Court will deny the motion to dismiss the entire complaint. Whether the conduct alleged in the Wrongful Death and Survival Action raised a potentiality of coverage is a close question. Discovery may establish whether Brown was a foster parent entitled to coverage. *See supra* Part II.B.1. Moreover, as the Maryland Court of Appeals has observed, a motion to dismiss is "rarely appropriate in a declaratory judgment action":

> The test of the sufficiency of the bill is not whether it shows that the plaintiff is entitled to the declaration of rights or interest in accordance with his theory, but whether he is entitled to a declaration at all; so, even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree.[24]

Accordingly, the Court will allow this action to proceed to discovery.[25]

---

[23] *See S. Carolina Dep't of Health and Envtl. Control v. Commerce & Indus. Co.*, 372 F.3d 245, 260 (4th Cir. 2004).

[24] *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 992 A.2d 459, 487-88 (Md. 2010) (internal citations and quotation marks omitted).

[25] The Court will, however, dismiss Counts III and IV (Wharton's claims) and Counts VII and VIII (Brown's claims). The Plaintiffs concede that Brown lacks standing because he has assigned his interest in the litigation, and Wharton lacks standing in her capacity as the representative of Kyla's estate. *See* ECF No. 11 at 25.

21

III. Conclusion

For the reasons stated above, General Star's motion to dismiss the complaint will be granted in part and denied in part.

3/5/12

Date

William D. Quarles, Jr.
United States District Judge